## Lucas v. Hagedorn, et al.

(Decided March 27, 1914.)

### Appeal from Fayette Circuit Court.

1. Principal and Surety—Husband and Wife—Notes—Liability of Wife—Section 2127, Kentucky Statutes.—In determining whether a married woman is principal or surety on a note, the courts will scrutinize the entire transaction, and regard the substance and not the form, and if it appear that the form of the transaction was a mere device or subterfuge to evade the statute, and that the wife was a mere surety in fact, she will not be held liable.

2. **Principal and Surety—Husband and Wife—Notes—Liability of Wife—Section 2127, Kentucky Statutes—Evidence.**—In an action to recover on two notes executed by two married women as consideration for a business which by certain contracts was sold and transferred to them, evidence examined, and held that H:, the brother-in-law of one and husband of the other, was the real purchaser, and that plaintiff knew this fact, and that the contracts were simply a device to evade Section 2127, Kentucky Statutes, providing that no part of a married woman's estate shall be subjected to the payment or satisfaction of any liability, upon a contract made after marriage, to answer for the debt, default or misdoing of another, including her husband, unless such estate shall have been set apart for that purpose by deed of mortgage or other conveyance.

BAILEY D. BERRY for appellant.

FORMAN & FORMAN and M. DON FORMAN for appellees.

OPINION OF THE COURT BY WILLIAM ROGERS CLAY, COMMISSIONER—Affirming.

Plaintiff, T. B. Lucas, brought this action against defendants, F. T. Hagedorn, Yetta Hagedorn, Hannah Silver and William Shubinski, to recover on two promissory notes, dated March 8, 1911, each for the sum of two thousand dollars, and payable respectively in one and two years from date.

During the progress of the case, F. T. Hagedorn died, and the action was not revived. On final hearing, plaintiff recovered judgment against William Shubinski for $1,250, and the action was dismissed as to Yetta S. Hagedorn and Hannah Silver. Plaintiff appeals.

The sole consideration for the notes was the sale and transfer by plaintiff of his produce and poultry business, which he was then conducting in Lexington, Kentucky, under the style of the Lexington Produce Company. The tangible assets actually transferred under the contract of sale amounted to only twelve hundred and fifty dollars, the remainder of the consideration, or twenty-seven hundred and fifty dollars representing the good will of the business.

In addition to a plea of coverture and suretyship by Mrs. Hagedorn and Mrs. Silver, defendants defended on the ground that the sale was obtained by fraud and misrepresentation; that there was a failure of consideration to the extent of $2,750; that in derogation of the good will

which he undertook to sell, plaintiff, for the purpose of re-establishing himself in the produce business, traduced the good name and impaired the credit of F. T. Hagedorn in such a way as to contribute to his failure in the operation of the business; and that plaintiff violated his contract of sale in that he did not deliver to the purchaser, a lease for five years upon the premises occupied, or for any length of time; and by engaging in the produce business in the city of Lexington both directly and indirectly within five years from the date of the sale; that plaintiff's misrepresentations which induced the sale, and his subsequent violation of the contract, resulted in a large loss to F. T. Hagedorn, the greater portion of which he borrowed from his wife and sister-in-law.

According to the evidence for the defendants, F. T. Hagedorn approached the plaintiff with a view of purchasing the latter's business. After several changes in the price, plaintiff agreed to turn over to Hagedorn, the eggs, poultry and chickens on hand at invoice price, $630; a horse and wagon, and the fixtures, valued at $250; and the sum of $370 in cash; and Hagedorn agreed to execute to plaintiff the two notes in question, with his wife, Yetta S. Hagedorn, and his sister-in-law Hannah Silver, and William Shubinski, as sureties. The contract was thereupon drawn, dated March 8, 1911. Plaintiff was the party of the first part, and Yetta S. Hagedorn was party of the second part. By the contract, plaintiff was to turn over to second party his produce and commission business together with all fixtures and appurtenances, including a lease for five years. He also bound himself not to engage in the poultry or produce business in Lexington or Fayette County, either directly or indirectly, and that he would not buy for himself or others, or sell for himself or others, any merchandise or stock of produce similar to that handled by the party of the second part. This provision was to remain effective for five years. The contract provided, however, that plaintiff should have the right to handle and sell eggs and poultry in connection with any retail grocery business which he might establish. He also bound himself not to accept employment from any commission or produce firm in Lexington or Fayette County, and not to solicit business for any such firm in said city or county, except the party of the second part. This contract was signed by plaintiff, and by Yetta S. Hagedorn "by F. T. Hagedorn."

After the execution of the above contract, it appears that a second contract embodying substantially the same terms was signed by plaintiff, and by Yetta S. Hagedorn, Hannah Silver; and in this second contract plaintiff is party of the first part and Yetta S. Hagedorn and Hannah Silver are parties of second part, the latter being the purchasers of the business.

The defendants all say that F. T. Hagedorn was the purchaser and being accustomed to doing business in his wife's name, he had the first contract drawn in her name; he had no authority from his wife to sign her name to the contract. After the contract was delivered and the business turned over to F. T. Hagedorn, plaintiff desired to consult his attorney in regard to the contract and notes which had been delivered to him. On his being advised that it would be better to have the contract signed by Mrs. Hagedorn and also by Mrs. Silver, as neither would be bound on a note if, as a matter of fact, they were both sureties, the second contract was drawn up and executed by the parties several days later.

Before making the sale, plaintiff told F. T. Hagedorn in the presence of Enoch Grehan, that he had made $16,-000 out of the business in four years. After making the sale, plaintiff told a number of parties that he had sold out to F. T. Hagedorn, and asked them to trade with him. He also assisted a man named Daniels in making sale of produce and poultry; and went into the grocery business with his brother-in-law sometime during the summer of 1911, and sold large bills of goods to John Hutchinson at less than Hutchinson could purchase them from others.

It was further shown that plaintiff started in the business as a bookkeeper for Wade & Sommer; Wade withdrew from the business which was continued by Sommer, who went to Arkansas and left plaintiff in charge. Plaintiff ran the business as agent for Sommer until he finally purchased it. This trade was closed about April 7, 1910, not quite a year before the sale in question. For a few months prior to that time, he had taken charge of the business for the purpose of paying to T. C. Fuller and the Lexington Banking & Trust Company an indebtedness due them by Sommer. On April 16th and on April 19th, 1909, he wrote his employer that there was not very much profit in the business, and advised him to make a sale of it. A few weeks later, he wrote his employer that everything was dead in Lexing-

ton, and he was doing business on a small profit. On February 12, 1910, he wrote T. C. Fuller that the margin in the business was very small.

According to the evidence for the plaintiff, he sold the business to Mr. Hagedorn for Mrs. Hagedorn. The contract and notes were presented to him March 8, 1911. Plaintiff took them to Mr. Duncan, his attorney, for the purpose of having him look over them. On being informed that the contract should be signed by Mrs. Hagedorn herself, and that Mrs. Silver's name added no strength to the note, and that Mrs. Hagedorn and Mrs. Silver had better buy the business themselves, he then went to see F. T. Hagedorn in regard to it. Certain modifications in the contract were made by Mr. Duncan. Plaintiff showed the modified contract to Hagedorn, who said he would go and see Mrs. Silver and find out if she would not take an interest in the business. On March 9, Hagedorn took the contract to Mr. Duncan, and returned with it to plaintiff's place of business. Mr. Melvin and Mr. Biddow were present at the time. Plaintiff told Mr. Hagedorn he would not deliver the business until the contract was corrected. Hagedorn returned with the two contracts signed by Mrs. Hagedorn and Mrs. Silver saying one was for himself and the other was for plaintiff. Thereupon, he turned the business over to Hagedorn. Two or three other witnesses who claimed to have been present testified that Mr. Hagedorn submitted the original contract and notes to plaintiff and plaintiff refused to turn over the business to him and told him he would have to see his lawyer. Plaintiff denies having told Mr. Hagedorn and Mr. Grehan that he made $16,000 out of the business in four years before making the sale; he admits having made this or a similar statement after the business was transferred. He further testified that he had actually made this amount, and claimed to have the property on hand representing this amount. He and Daniels testified that he merely went by Daniels' booth and occasionally assisted Daniels when he was busy, and that he received no compensation for this, except an occasional chicken. He further testified that he had not accepted employment from any commission or produce concern in Lexington or Fayette County and had not directly or indirectly bought or sold for others; that the only reason he was anxious to make the sale was that he was a very sick man and the doctor had told him he would not live if he continued in that business. On cross ex-

amination plaintiff admitted that $1,250 represented the total value of the tangible assets actually transferred on the occasion of the sale. He admitted writing his former employer the letters mentioned, and also that to Mr. Fuller, but claims that as he desired to buy the business, he did not want to make it appear too prosperous. All the negotiations were carried on by Mr. Hagedorn. Plaintiff never saw Mrs. Hagedorn or Mrs. Silver. Hagedorn said he bought it for his wife. Hagedorn agreed that if plaintiff would sell the business on twelve and twenty-four months time and would invoice all produce on hand and add enough money to make it $1,000, he would give plaintiff two notes for $1,000 each, due in one and two years, with interest thereon at six per cent. Hagedorn had the contract prepared. He returned with the contract and the two notes. Nothing was said about Mrs. Silver buying the business until Mr. Duncan suggested that she should be one of the purchasers. After that, Mr. Hagedorn took the new contract prepared by Mr. Duncan and had Mrs. Hagedorn and Mrs. Silver sign it. In his opinion, the provision in regard to the lease for five years was inserted after the original contract was executed; he had not agreed to give a lease for five years, as he was merely renting by the month himself. Mr. Duncan only prepared the new contract. He did not change the notes. After selling out, plaintiff went into the grocery business at Cedar and Broadway and handled eggs and chickens, but was only in the business for a period of about one month. Other witnesses testified that plaintiff was doing nearly all the produce and commission business at the time he sold out, and had a good and prosperous business; and further testified that Mr. Hagedorn was addicted to drinking, and this might account for his failure to make a success of the business after his purchase. Mr. Duncan had no personal recollection of the time of preparing the second contract. His memory however was that the plaintiff brought the contract and notes and showed them to him. For the service rendered, he entered a charge dated March 11th, on his books. Could not say that this was entered on the day the services were performed; may have been entered later though it was his custom to enter a charge near or about the time the service was performed.

It also appears that some months after the sale, a corporation was formed, and in this corporation, Mrs.

Silver and Mrs. Hagedorn each took twelve shares and Mr. Hagedorn one share of the stock. Sometime later, this corporation sold to Lucas for $1,000. Lucas wanted an assignment of the original contract of sale which he had made to Mrs. Silver and Mrs. Hagedorn, but they declined to sign it. On this question, both Mrs. Hagedorn and Mrs. Silver testified that they took this stock merely to secure them for the money which they had advanced to Mr. Hagedorn to carry on the business. They also say that they never purchased the business, but simply signed the second contract because Mr. Hagedorn insisted that it was necessary to do so, as it was demanded by the plaintiff, Lucas.

Section 2127, Kentucky Statutes, provides in part as follows:

"No part of a married woman's estate shall be subjected to the payment or satisfaction of any liability, upon a contract made after marriage, to answer for the debt, default or misdoing of another, including her husband, unless such estate shall have been set apart for that purpose by deed of mortgage or other conveyance; but her estate shall be liable for her debts and responsibilities contracted or incurred before marriage, and for such contracted after marriage, except as in this act provided."

No part of Mrs. Hagedorn's or Mrs. Silver's estate was set apart by mortgage or other conveyance. Therefore, their liability turns on whether they were principals or mere sureties in the transaction. Counsel for appellant argues with great force that the following facts show clearly that Mrs. Hagedorn and Mrs. Silver were principals and not sureties. The notes were signed in blank by them, and turned over to Mr. Hagedorn as their agent. He himself had the first contract drawn up. In this contract Mrs. Hagedorn was named as a purchaser. Appellant then declined to carry out the sale until he consulted his attorney. Thereupon the second contract was drawn. This contract was signed by both Mrs. Hagedorn and Mrs. Silver. Not until then would appellant turn the business over. In addition to these facts, it appears that later on, when the corporation was formed, Mrs. Hagedorn and Mrs. Silver both received 25 shares of stock in that corporation, while Mr. Hagedorn received only one share. It is therefore insisted that not only was the sale made to them, but they continued to

and did assert an interest in the property by virtue of the sale. Our attention is called to the rulings of this court to the effect that the statute was not designed to prevent a married woman from borrowing money or making a contract, but that, on the contrary, the wife, as principal, may constitute her husband an agent, and if he delivers a note signed by her to the payee, and a check for the proceeds is made payable to the wife, or the money paid to her, or the amount of the check placed to her credit, and the transaction is in other respects free from a purpose to evade the statute, the wife will not be allowed to defeat the payment of the debt on the ground that she was merely a surety, although, as a matter of fact, she may not have received the use or benefit of any part of the money. Third National Bank of Louisville v. Turney, 110 S. W., 293, 33 Ky. L. R., 418; Swearengen's Ex'r. and Trustee v. Tyler, 132 Ky., 458; 116 S. W., 331. While holding to the doctrine above announced, it is also true that this court has held in a number of cases that it will scrutinize the whole transaction, and will look to the substance, and not to the form, and if it appear that the form of the transaction was a mere device or subterfuge to evade the statute, and that the wife was a mere surety in fact, she will not be held liable. Hines v. Hays, 82 S. W., 1007; Hart v. Bank of Russellville, 127 Ky., 424, 32 Ky. L. R., 338, 105 S. W., 934. In the case of Hines v. Hays, *supra*, F. L. Hays, wishing to borrow money of a bank, offered his mother as surety. The bank refused to accept her, as she was a married woman, and informed Hays they would accept her note for the desired amount, with him as surety. The note was thus executed and accepted at the bank, and the proceeds placed to her credit. She afterwards gave her son a check on the bank for the amount received upon the note. This was held to be a mere technical arrangement to evade the effect of the statute. Looking beneath the form of the transaction, the question is: Who was the real purchaser of the business? Appellant does not testify to any facts leading up to the transaction showing an honest belief on his part that either Mrs. Hagedorn or Mrs. Silver was negotiating for the business, or that the sale was, as a matter of fact, made to either. He simply says that he sold the business to Hagedorn for Mrs. Hagedorn. On the other hand, Hagedorn says that he told appellant he was buying the business for himself, and would give Mrs. Hagedorn and Mrs. Silver as

sureties on the note. Appellant expressed himself as satisfied with these sureties. Hagedorn carried on all the negotiations. Neither Mrs. Hagedorn nor Mrs. Silver ever had any dealings with appellant. Both Mr. and Mrs. Hagedorn say that Hagedorn never had authority to sign his wife's name to the first contract. Appellant stated to more than a dozen witnesses that he had sold out his business to Mr. Hagedorn. After telling one of the witnesses that he had sold out to Mr. Hagedorn, he said: "I got his note with four of the best Jews on it in town." When the business got in debt he did not sue or attempt to sue Mrs. Hagedorn, but brought suit against Mr. Hagedorn. Certainly Mrs. Silver's name was never mentioned in the transaction until the question of her liability on the note was brought up. After the original papers were drawn up Hagedorn consulted his attorney, who properly advised him that Mrs. Hagedorn and Mrs. Silver, being mere sureties, were not liable on the note. Then it was that the new contract was drawn up and signed by Mrs. Silver and Mrs. Hagedorn. What was the purpose of it? To make a new contract of sale? Certainly not. The sole purpose was to make Mrs. Hagedorn and Mrs. Silver appear as principals in the transaction so that they would be liable on the notes which they had executed. While it is true that Mrs. Hagedorn and Mrs. Silver took stock in the corporation subsequently formed, the weight of the evidence is to the effect that they did this to secure themselves, so far as they could, for sums of money which they had each advanced to Mr. Hagedorn. Certainly neither one of them exercised any control over the business. On the contrary, Mrs. Silver shows that she regularly paid her bills for produce that was furnished her. As appellant knew that Mr. Hagedorn was the real purchaser, and Mrs. Hagedorn and Mrs. Silver were mere sureties, he was not misled by the fact that Mrs. Hagedorn and Mrs. Silver signed the second contract of sale. Being of the opinion that Mr. Hagedorn was the principal in the transaction, and that his wife and Mrs. Silver were mere sureties, it follows that the chancellor correctly held that Mrs. Hagedorn and Mrs. Silver were not liable on the notes in question.

On the other features of the case we see no reason to disturb the finding of the chancellor.

Judgment affirmed.