## Simmons v. Maxey.

(Decided March 11, 1932.)

E. C. O'REAR, ALLEN PREWITT and I. G. MASON for appellant.

RODES & HARLIN and CLARENCE EVANS for appellee.

OPINION OF THE COURT BY HOBSON, COMMISSIONER—Reversing.

This action was brought by L. P. Maxey against Louise S. Simmons to recover on two notes signed by her and her husband, R. N. Simmons, also a note signed, "Simmons Drug store, R. N. Simmons," and dated December 3, 1926. Mrs. Simmons in defense pleaded her coverture and alleged that she was only the surety of her husband and that the transaction was a mere subterfuge to conceal this fact. Proof was taken and on final hearing judgment was entered against Mrs. Simmons. She appeals.

The facts shown by the evidence are, in brief, these: Maxey was running a drug store in Adairville. R. M. Simmons proposed to buy it from him and they fixed the price at $11,000. They then went to an attorney to put the contract in writing, who makes this statement as to what occurred:

"I remember that Mr. Maxey and Mr. Simmons came to me and stated that Simmons did not have any money and that his wife, whom I had known since she was a girl and always referred to as Louise, and Louise was going to sign these notes as surety and I told them she could not do that; that she would not be bound for the payment of the notes and that the only way it could be handled was for

Mr. Maxey to sell to Louise and Roland jointly. This was done and the contract was prepared accordingly. I understood that Mr. Maxey would not sell to Roland without his wife could be bound in some way, as Roland did not have any property.''

The attorney drew up, on that day, the contract by which the property was sold to Mrs. Simmons and her husband jointly. He also drew up the notes required by the contract. Before the parties left the attorney says this occurred:

> ''I told them at the time that Mrs. Simmons was bound for the Maxey and Conn debt and probably one to the bank Mr. Maxey was surety on, anyway it embraced the consideration for the Maxey trade and that if Mrs. Simmons was not to remain liable for the future debts of the concern that she should convey her interest in the property to her husband R. M. Simmons and on this idea, that while I felt that Roland Simmons would be successful in the business yet if he were not she would be protecting herself to that extent.''

Simmons took the papers home, and his wife, as she says, signed them at his request without reading them or knowing what was in them, supposing that she was going his surety for the money. On December 6, Simmons wrote to the attorney and asked him to draw up the paper that he had suggested so that his wife would not be liable for future debts of the store. He drew up a paper dissolving the partnership and mailed it to Simmons. Simmons and his wife signed it and it was recorded a day or two later. She says that she signed this paper just as she did the other, at her husband's request and without reading it or knowing what was in it; he telling her that the lawyer advised it. About a year later R. M. Simmons went into banqruptcy and this suit was brought against Mrs. Simmons.

Maxey does not testify as to having any conversation with Mrs. Simmons. All his transactions were had with her husband. He does testify that he sold the property to the husband for him and his wife, but he does not show that she had anything to do with the transaction, except he says that she was present at the conference with the lawyer. She says she was not present, and her

testimony is confirmed by the lawyer, who says in substance that he has no recollection of her being present. It is also confirmed by the fact that on the same day, December 3, Maxey executed a lease on the store building, which he owned, and this lease was made to R. M. Simmons alone, which confirms Mrs. Simmons' testimony and shows that Maxey knew that he was dealing with R. M. Simmons. Section 2127, Kentucky Statutes provides:

"No part of a married woman's estate shall be subjected to the payment or satisfaction of any liability, upon a contract made after marriage, to answer for the debt, default or misdoing of another, including her husband, unless such estate shall have been set apart for that purpose."

In Crumbaugh v. Postell, 49 S. W. 334, 20 Ky. Law Rep. 1366, the notes sued on were signed by the wife as principal by her husband as surety. Holding that the wife was not liable, as the notes were given for the debt of the husband, the court said:

"In transactions of this kind the courts must look to the substance, and whatsoever the parties themselves may designate or name the undertaking of the wife, if in fact it be an attempted assumption by her of the debt of another, she must be held not liable, unless she binds herself in the statutory mode. Any other course will speedily result in a nullification of the statute."

In Hines & Co. v. Hays, 82 S. W. 1007, 26 Ky. Law Rep. 967, Hays desired to borrow $350 from the bank and offered his mother and his brother as his sureties. The officer of the bank told him that he could not take his mother as surety, because she could not bind herself in that capacity, but that he could make the note with the mother as principal and the son as surety and he would take the note. This was done; the bank discounted the note and placed the proceeds to the credit of the mother, and she gave her son a check for the money. Holding that the mother was not bound, the court said:

"The signing by the mother, M. E. Hays, of the note, first, and placing the proceeds to her credit, was a mere technical arrangement to avoid the effect

of the statute prohibiting married women binding themselves as sureties.''

In Lucas v. Hagedorn, 158 Ky. 369, 164 S. W. 978, 981, the facts were these: Hagedorn proposed to buy Lucas' business and agreed to execute notes for the price with Mrs. Hagedorn and Mrs. Silver as his sureties. The contract was dated March 8, 1911; Lucas was the party of the first part, and Mrs. Hagedorn was the party of the second part. It was signed, ''Yetta S. Hagedorn by F. T. Hagedorn,'' and was taken by them to an attorney who advised that it should be signed by Mrs. Hagedorn herself and that Mrs. Silver's name added no strength to the note, and that Mrs. Hagedorn and Mrs. Silver had better buy the business themselves. Lucas told Hagedorn he would not deliver the business until the contract was corrected. On March 9, 1911, a new contract was drawn in which Mrs. Hagedorn and Mrs. Silver were the parties of the second part; it was signed by them, and they also signed the notes for the agreed consideration which were accepted by Lucas and were sued on by him. Holding that Mrs. Hagedorn was not liable on the notes, the court said:

''Looking beneath the form of the transaction, the question is: Who was the real purchaser of the business? Appellant does not testify to any facts leading up to the transaction showing an honest belief on his part that either Mrs. Hagedorn or Mrs. Silver was negotiating for the business, or that the sale was, as a matter of fact, made to either. He simply says that he sold the business to Hagedorn for Mrs. Hagedorn. . . .

''After the original papers were drawn up, Hagedorn consulted his attorney, who properly advised him that Mrs. Hagedorn and Mrs. Silver, being mere sureties, were not liable on the note. Then it was that the new contract was drawn up and signed by Mrs. Silver and Mrs. Hagedorn. What was the purpose of it? To make a new contract of sale? Certainly not. The sole purpose was to make Mrs. Hagedorn and Mrs. Silver appear as principals in the transaction so that they would be liable on the notes which they had executed. . . .

''As appellant knew that Mr. Hagedorn was the real purchaser, and Mrs. Hagedorn and Mrs. Silver

732

were mere sureties, he was not misled by the fact that Mrs. Hagedorn and Mrs. Silver signed the second contract of sale. Being of the opinion that Mr. Hagedorn was the principal in the transaction, and that his wife and Mrs. Silver were mere sureties, it follows that the chancellor correctly held that Mrs. Hagedorn and Mrs. Silver were not liable on the notes in question.''

The statute was enacted to protect married women from liability as the surety of another. Most wives will be slow to refuse to sign on the dotted line when told to do so by their husbands. The husband is the head of the family, and the purpose of the statute would be defeated if its application could be avoided by such a mere form as we have here. Mrs. Simmons had no idea of buying the store. The testimony of the attorney above quoted, who testified as a witness for the planitiff, is wholly uncontradicted and is conclusively confirmed by the lease which Maxey executed to the husband on the same day for the building in which the store was kept. The facts of this case cannot be distinguished from those in the case last above quoted. To the same effect, see Hart v. Bank of Russellville, 127 Ky. 424, 105 S. W. 934, 32 Ky. Law Rep. 338; Brady v. Equitable Trust Co., 178 Ky. 693, 199 S. W. 1082; Bartley v. Ford's Ex'x, 220 Ky. 71, 294 S. W. 800; Bank of St. Helens v. Mann's Ex'r, 226 Ky. 381, 11 S. W. (2d) 144.

Judgment reversed, and cause remanded for a judgment dismissing the petition.